IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Southern Land and Golf Company Ltd. and Tidewater Builders, | ) ) ) |
| Plaintiffs, | ) C/A No. 2:03-2189-DCN ) ) |
| vs. | ) ) **ORDER and OPINION** |
| Harleysville Mutual Insurance Company, | ) ) |
| Defendant. | ) ) |

Plaintiffs Southern Land & Golf Co., Ltd. ("Southern Land") and Tidewater Builders, Inc. ("Tidewater") filed this action in state court on May 29, 2003, naming defendant Harleysville Mutual Insurance Co. ("Harleysville"). Plaintiffs seek a declaratory judgment as to defendant's obligations under an insurance policy issued to plaintiffs, and claim breach of contract and bad faith refusal to pay an insurance claim. The suit was subsequently removed to this court.

## **I.     BACKGROUND**

In 1996 Southern Land began planning a development in Myrtle Beach known as Harbor Loft at Tidewater Development ("Harbor Loft"). Tidewater was a subsidiary of Southern Land, and was the general contractor for the entire project. Southern Land (the owner/developer) sold lots to future owners, and then contracted with those owners to have Tidewater construct the units. All of the units were constructed by February 1999. Harleysville then issued an insurance policy to Southern Land and Tidewater, providing coverage from June 1, 1999 until June 1, 2000. According to plaintiffs, Southern Land is the primary insured and Tidewater is listed as an additional insured.

At the time the policy was sold, both the general manager at Southern Land (Henry Munn) and the agent who sold the policy to plaintiffs (John Cook) understood the policy to cover any damage to the units caused by a subcontractor's improper workmanship or design. (Munn Aff. ¶ 2; Cook Aff. ¶ 3.) Plaintiffs paid a $57,153 premium, which included a commercial general liability portion of $12,635.

In June 1999 plaintiffs were notified of water intrusion in several units, which stained ceilings and caused other damage. An investigation revealed that a subcontractor's defective design and installation of the units' railing system allowed the water intrusion, which damaged the interior of the structures. Various property owners and the homeowners association brought claims against plaintiffs. Jerry Wyles, the Vice President of Tidewater (who was also the Superintendent on the repairs project) recalls that one of defendant's adjusters participated in the investigation of the water damage, suggested individuals and methods to determine the cause of the leaks, and photographed the damage. By the time the cause of the water leak was determined, defendant was already defending plaintiffs in a suit brought by a unit owner (Drake) for damage to a single unit, which ultimately settled.[1] During that litigation, one of defendant's adjusters (Clarke) came to Harbor Loft to examine the damage. During that visit, Wyles recalls that Clarke instructed the plaintiffs to "go on and take care of it. We'll help you - we'll take care of it." (Wyles Dep. at 21.) Based on their understanding of the policy and Clarke's statements, plaintiffs repaired all the units in the subdivision, including those

---

[1] Defendant maintains that it issued a reservation of rights letter before plaintiffs began repairs on all the roofs.

2

which did not yet show signs of water damage, at a cost of $1,038,953.00. (Munn Aff. ¶ 6.) On January 22, 2003 defendant denied coverage for the costs of the repairs and refused to reimburse plaintiffs, and this action followed. Defendant seeks summary judgment on all claims. Plaintiffs have filed a summary judgment motion as to the declaratory judgment.

During the pendency of this action the underlying case law regarding coverage for damage stemming from faulty workmanship has been the subject of considerable debate. Plaintiffs purchased the policy on June 1, 1999. Plaintiffs advance an affidavit of a highly regarded construction lawyer who states that prior to the South Carolina Court of Appeals decision in L-J, general contractors' CGL policies were generally thought to cover a subcontractor's defective work and the damage stemming from that work. (Bruner aff.¶ 3.) On June 30, 2002, the state court of appeals handed down its decision in L-J, Inc. v. Bituminous Fire and Marine Insurance Co., 350 S.C. 549, 564 S.E.2d 489 (Ct. App. 2002). Nonetheless, on January 22, 2003 defendant denied coverage for plaintiffs' claim. This declaratory judgment action was filed soon after, on June 3, 2003. On August 9, 2004, the South Carolina Supreme Court reversed the court of appeals' holding in L-J. The supreme court released its latest version of L-J in September 2005. See L-J, Inc. v. Bituminous Fire and Marine Ins. Co., 366 S.C. 117, 621 S.E.2d 33 (2005).

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when, after considering the full evidentiary record, there are no genuine issues of material fact. Fed. R. Civ. P. 56(c). When the party moving for summary judgment does not bear the ultimate burden of persuasion at

3

trial, the burden for summary judgment may be discharged by "pointing out to the court that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Evidence should be viewed in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, a "mere scintilla" of evidence will not preclude summary judgment. The court's inquiry is "not whether there is literally no evidence, but whether there is any [evidence] upon which a jury could properly . . . find a verdict for the party" resisting summary judgment. Id. at 251.

### III.     DISCUSSION

#### a.     Policy Coverage

Plaintiffs seek reimbursement for repairing damage which resulted from their subcontractors' faulty work. Tidewater was the general contractor; therefore, the entire project was its "work product." Under this court's interpretation of L-J, damage to insured's own work product is not an "occurrence." See Bituminous Cas. Corp. v. R.C. Altman, et al., C/A No. 2:01-4267-DCN, Orders of July 28, 2006 and August 21, 2006. At the August 9, 2006 hearing on the motions for summary judgment, plaintiffs' counsel acknowledged that Altman controls the coverage determination in this case. Following the hearing on these motions, plaintiffs submitted a motion for reconsideration of Altman. On August 21, 2006 this court denied the motions for reconsideration in Altman.

Plaintiffs further contend Altman only applies to Tidewater since Southern Land was the owner/developer, not the general contractor. The court does not find this

4

argument persuasive, as Tidewater was a subsidiary of Southern Land.

### b. Estoppel

Plaintiffs contend that defendant is estopped from denying coverage after allegedly representing that the policy would allow reimbursements for the repairs.

Under South Carolina insurance law, estoppel cannot extend or create coverage. <u>Campbell v. N. Ins. Co. of N.Y</u>., 337 F. Supp. 2d 764, 770 (D.S.C. 2004). This rule is subject to one exception: "the scope of risk under an insurance policy may be extended by estoppel if the insurer has misled the insured into believing the particular risk is within the coverage." <u>Standard Fire Ins. Co. v. Marine Contracting and Towing Co., et al</u>., 301 S.C. 418, 421, 392 S.E.2d 460, 462 (1990).

A party claiming equitable estoppel must demonstrate "(1) ignorance of the party invoking it of the truth as to the facts in question, (2) representations or conduct of the party estopped which mislead, (3) reliance upon such representations or conduct; and (4) prejudicial change of position as the result of such reliance." <u>Id</u>. at 422, 392 S.E.2d at 461. As to the party estopped, the elements include

> (1) conduct that amounts to a false representation or concealment of material facts, or at the least, which is calculated to convey the impression that the facts are other than, and inconsistent with, those that the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; and (3) <u>knowledge, actual or constructive, of the real facts</u>.

<u>Campbell</u>, 337 F. Supp. 2d. at 770 (emphasis added) (citing <u>S. Dev. Land and Golf Co., Ltd v. South Carolina Pub. Serv. Auth,</u> 311 S.C. 29, 33, 426 S.E.2d 748, 751 (1993)).

Plaintiffs' motion for summary judgment is premised on three alleged misrepresentations: (1) the mutual expectations of coverage, (2) coverage tendered in the

Drake case, and (3) Clarke's statements.

The parties' mutual expectations of coverage are not a basis for estoppel. Even if both parties expected the policy to cover damage stemming from faulty workmanship, South Carolina has not adopted the doctrine of "reasonable expectations" in construing insurance policies. The doctrine of reasonable expectations recognizes "the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts . . . even though painstaking study of the policy provisions would have negated those expectations." Allstate Ins. Co. vs. Mangum, 299 S.C. 226, 231, 383 S.E.2d 464, 467 (Ct. App. 1989). This rule "has never been accepted by the supreme court of this state." Id.

Defendant's coverage for a single homeowner's suit (Drake) cannot support estoppel as to coverage for the entire complex. Defendant undertook coverage in that case subject to a reservation of rights. This act is not a representation of coverage for the entire complex. Defendant's actions in the Drake case cannot support plaintiffs' estoppel claim.

Plaintiffs emphasizes Clarke's alleged statement of "go on and take care of it. We'll help you - we'll take care of it." The parties dispute the context and meaning of the statement, and whether the statement is binding on defendant. Even if all of these considerations fall in the insured's favor, it is unlikely estoppel is available. Plaintiffs will have a difficult time demonstrating the first element of estoppel ("ignorance of the party invoking it of the truth as to the facts in question."). Unlike Preferred Risk Mutual

Insurance Co. v. Thomas, 372 F.2d 227 (4th Cir. 1967),[2] there are no concealed "real facts" in this dispute. Rather, plaintiffs assert defendant was concealing the interpretation of case law. The party estopped did not have knowledge of a fact unknown to insured. Insurer does not know more about the "facts in question" than insured.

The "fact in question" is not the existence of an exclusion, as in Preferred Risk, but the legal interpretation of the policy. Plaintiffs apparently claim that insured knew the truthful legal interpretation, but told plaintiffs the opposite. As of yet there is no "truthful" interpretation of L-J. The judges in this courthouse and throughout the district disagree on the decision's application. Even if there was a "truthful" interpretation of L-J, it is doubtful this could be the basis for estoppel. In this instance the "truth" is not a fact (a policy exclusion) but rather the interpretation of the policy pursuant to L-J. Similarly, the elements of estoppel as to the party being estopped cannot be met, as defendant did not have knowledge of the "real facts."

    **c.**    **Breach of Contract and Bad Faith Refusal Claims**

Plaintiffs also allege breach of contract and bad faith refusal to pay an insurance claim. The breach of contract claim is premised on defendant's alleged failure to

---

[2] In Preferred Risk, insured sought coverage for injuries sustained in an car accident. His truck was being used as a livery. The policy specifically excluded any claim based on use of the vehicle as a livery. However, the agent who sold the policy knew about the truck's use as a livery when the policy was sold. The insured did not know about the exclusion because the policy was not delivered to him until after the accident. On these facts, the Fourth Circuit held that "the South Carolina courts will not permit an insurer, who has misled an insured into believing that a particular risk is within the coverage of the policy, to use the contract itself to prove the contrary." Preferred Risk, 372 F.2d at 229. In contrast, plaintiffs had the policy and are sophisticated developers. Further, the alleged "difference" in knowledge concerns the interpretation of the policy, not the existence of an exclusion.

reimburse plaintiffs.  Pursuant to this court's holding in Altman, defendant's refusal was justified, and there is no breach.

A party claiming bad faith denial must demonstrate

(1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured.

Cock-N-Bull Steak House, Inc. v. Generali Ins. Co., 321 S.C. 1, 6, 466 S.E.2d 727, 730 (1996).  Since no benefits were due under the contract, plaintiffs cannot state a bad faith claim.

## IV.     CONCLUSION

For the reasons stated above, it is therefore **ORDERED** that defendant's motion for summary judgment on all claims be **GRANTED**.  It is further **ORDERED** that plaintiffs' motion for summary judgment be **DENIED**.

For the reasons stated in this court's August 21, 2006 order in C/A No. 2:01-4267-DCN (Bituminous Casualty Corp. v. R.C. Altman, et al.), plaintiffs' motion for reconsideration of Altman is **DENIED**.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 22, 2006**
**Charleston, South Carolina**